Joseph NIEVES, Plaintiff,

v.

**METROPOLITAN DADE COUNTY, Defendant.**

No. 82–2615–Civ.

United States District Court,
S.D. Florida.

Dec. 6, 1984.

Jesse J. McCrary, Jr., Miami, Fla., for plaintiff.

Lee A. Kraftchick, Asst. County Atty., Miami, Fla., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

### Nature of the Action

THIS CAUSE came on for trial before the Court without a jury on Plaintiff JOSEPH NIEVES' Complaint (Docket No. 1) alleging violation of Title 42 of the United States Code, Section 2000e for alleged discrimination in employment based on national origin. The Court heard and received into evidence live testimony, deposition testimony and numerous exhibits, and has had the benefit of closing argument by counsel.

The Court having considered the foregoing and having been otherwise fully advised in the premises, sets forth herein its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff JOSEPH NIEVES is a citizen of the United States and a resident of Dade County, Florida.

2. Defendant METROPOLITAN DADE COUNTY is a political subdivision of the State of Florida and operates a mass transit system known as Metrobus. Metrobus is engaged in an industry affecting interstate commerce.

3. On April 1, 1974, Defendant hired Plaintiff to serve as a Transit Information Clerk for Metrobus. Transit Information Clerks answer passenger inquiries about bus routes and fares.

4. When Plaintiff first applied for the Transit Information Clerk position, he was asked to fill out an application form indicating his "race and/or nationality or both". The form requires applicants to check the "appropriate box or boxes". Plaintiff marked the box for "Caucasian" but left the box for "Spanish-American" blank. As a result, Mr. Nieves was listed as Caucasian, not of Spanish American national origin, in his Dade County personnel record.

5. According to the Plaintiff, when he first began working for Metrobus, he told a number of persons that he was Hispanic, but the only person he could initially recall telling was Ron Tober. Mr. Nieves testified that he told Tober of his national origin at an initial interview. Peter Andolina, Nieves' immediate supervisor, was at the initial interview with Tober but did not hear Nieves mention his national origin.

6. Joseph Jakobsche became the Director of Plaintiff's Department in September 1976. By the time Jakobsche arrived at Metrobus, Tober had already left, so it was impossible for Tober to convey whatever knowledge he may have had about Nieves' national origin to Jakobsche. Nieves admitted on cross-examination and in his deposition that he never told Jakobsche of his national origin. On rebuttal, Nieves testified for the first time that he might have mentioned his national origin to Jakobsche during a brief conversation.

7. Dade County regularly evaluates its employees using a standardized employee evaluation form. On his first evaluation, Plaintiff was rated satisfactory. On his 1974–75 evaluation, he was again rated satisfactory overall but "weak" in the category of "personal relations with fellow employees and supervisors". The rater, Peter Andolina, commented that Nieves' "rapport with fellow workers does need improvement". In his 1975–76 evaluation, Plaintiff was again rated satisfactory but "weak" in personal relations with fellow employees. Peter Andolina explained that these "weak" ratings in personal relations were the result of complaints he had received from Nieves' co-workers and his own observation of Nieves' difficulty getting along with fellow employees.

8. Prior to 1978, the Transit Information Clerks did not have their own supervisor. Scheduling for unforeseen vacancies, writing reports and other matters were handled by a "lead worker", Fred Werner. He received a salary supplement to compensate him for these additional duties.

9. Sometime in 1977, Metrobus decided to create a supervisor position for the Transit Information Clerks. As the Director of Planning and Marketing, Joseph Jakobsche was given the task of deciding who to hire for the new position. He first considered offering the position to his secretary, Esther Guerrero, an Hispanic female. Jakobsche felt that Guerrero was qualified for the position because she often acted as his liaison with the Transit Information Clerks and had previously worked as a traffic manager for an export company where she supervised several employees. Ms. Guerrero told Mr. Jakobsche that she was not interested in the position.

10. After discussions with the Transit Information Clerks' collective bargaining representative, the Transit Workers Union (TWU), Jakobsche agreed to select the

Transit Information Supervisor from among the ranks of the existing clerks. Prior to making his selection, Jakobsche consulted William Imhof from the Metrobus Personnel Department. Jakobsche told Imhof about the Transit Information Supervisor position and his desire to fill the position quickly. Imhof decided that the position could best be filled by using the County's "special certification" procedure rather than by using a standard promotional examination. The special certification process is used to fill positions where the position has very few incumbents and specialized skills or education is required. In lieu of an examination, recruitment decisions are made on the basis of "the credentials of the applicants as well as the departmental interview and probationary period". Imhof called the Dade County Central Personnel Department and received verbal confirmation that the special certification procedure was appropriate for selecting the Transit Information Supervisor.

11. The next step in the process was to create a written job specification for the Transit Information Supervisor position. Mr. Imhof drafted such a specification based on the information provided to him by Mr. Jakobsche and his own background in personnel. The written job specification served as a guideline for the remainder of the recruitment process.

12. Jakobsche decided to use a written examination in lieu of an oral interview. He did so primarily because he felt that by allowing the applicants to express themselves in writing they could more fully explain their views on some issues that were of concern to him. He also felt that a written test would help in assessing the candidate's writing ability. Finally, he felt that using a written examination would expedite the recruitment process by making individual interviews unnecessary.

13. Jakobsche drafted a series of general questions about management style and the applicants' views about how to improve Metrobus service. As even the Plaintiff admitted, the individual questions were acceptable and similar to the types of questions that might be asked at a job interview. The applicants were instructed that no question "has only one right answer" and that they could take as much time as they desired to complete the examination so long as it was turned in by the end of the day. Jakobsche showed the test to Imhof and asked for his comments. Imhof approved the use of the test because he felt the questions were related to the Transit Information Supervisor position and typical of what was normally asked at an interview.

14. The Dade County Personnel Director, Robert Gangwish, confirmed that the written examination complied with the County's guidelines for employment interviews. The written examination questions were all decided upon in advance, the same questions were asked of each candidate and the same format and instructions were given to each candidate. The guidelines for interviews also suggest that the interviewer make notes to assist in making the final decision. This guideline was surpassed by having the applicants write out their answers. Although there was much discussion about the subjective nature of the test, as the Dade County Personnel Rules recognize, interviews yield "inherently subjective information".

15. On November 30, 1977, Jakobsche posted a notice announcing that the test for the Transit Information Supervisor position would be given the next day. Four persons signed up for the test, Annie Wooten, Fred Werner, Charles Horton, and the Plaintiff.

16. After the applicants had written out their answers to the test question, Jakobsche had them typed-up by his secretary. Jakobsche graded the answers and ranked the candidates as follows: #1 Charles Horton; #2 Fred Werner and Plaintiff (tie); #4 Annie Wooten. Jakobsche then showed the questions and answers to two of his fellow supervisors without revealing the names of the candidates. The fellow supervisors agreed with Jakobsche that Horton's answers were the best.

17. Before making his decision, Jakobsche also reviewed each of the candidates' personnel files. He found that Horton had eleven years of experience as a Transit Information Clerk, Werner ten years, and Plaintiff only four years. Both Horton and Werner had approximately twenty years of experience in the bus system, while Plaintiff had only four years. The applicants' most recent evaluations, for the period 1975 to 1977, revealed that Horton was satisfactory, that Werner was between satisfactory and outstanding, and that while Plaintiff was generally rated satisfactory, his relations with fellow employees were "weak". Evaluations prior to 1975 showed that Horton was generally satisfactory but that he needed improvement in his relations with the public. Werner's pre-1975 evaluations were between satisfactory and outstanding. Nieves had only one evaluation prior to 1975; that evaluation was satisfactory. With respect to supervisory experience, the personnel records indicated that Horton had run his own bus directory business for slightly more than one year, that Werner had served as a lead worker between 1973 and 1978 and that he was rated satisfactory in ability to supervise, and that Plaintiff had served as a supervisor at an airline shipping firm for approximately eight years. Both Horton and the Plaintiff had taken the Dade County Preparation for Supervision Course. Plaintiff had the most years of education; he had received an AA degree in 1963, Werner had finished high school, and Horton had only finished the 11th grade.

18. In addition to considering the test results and the applicants' personnel files, Jakobsche also considered some comments he had received concerning the applicants from their co-workers and prior supervisor. Prior to the selection, Rosie Johnson had spoken to Jakobsche about Nieves' threat to fire her if he became the next supervisor. Ms. Johnson recalls making a similar comment about Charlie Horton; unfortunately this comment was made after Horton was selected. Other employees, including David McCann, confirmed that Mr. Nieves' deportment on the job was less than adequate. Peter Andolina, Jakobsche's predecessor and Nieves' former supervisor, also told Jakobsche that Nieves had had problems getting along with his co-workers and as a result was not likely to make a good supervisor.

19. Based upon his review of the candidates' personnel files, the test results, and his general perception of the candidates' abilities, Jakobsche decided to offer the job to Charlie Horton. Horton had performed the best on the test, he had the most seniority, and as far as Jakobsche knew he seemed to have the ability to get along with his co-workers.

20. Jakobsche's perception of Horton's relations with his fellow employees was apparently mistaken. Shortly after Horton was selected, the other Transit Information Clerks objected to the selection because in 1975 Horton had been arrested and charged with selling untaxed cigarettes. Many of the Transit Information Clerks, including the Plaintiff, had bought the illegal cigarettes from Horton, but they still felt that Horton's criminal record made him unqualified to serve as a supervisor. Jakobsche was aware of Horton's arrest at the time of his selection, but felt this factor was not relevant to the determination of who would make the best supervisor. He felt Horton had paid his debt for his indiscretion and that he should be given a second chance. Faced with the hostile reactions of his fellow workers, however, Horton voluntarily decided to step down.

21. After Horton stepped down, Plaintiff went to Mr. Jakobsche to talk about his qualifications for the supervisor position. Plaintiff explained why he felt he should receive the position. Jakobsche replied that while he was satisfied with Plaintiff's performance as a Transit Information Clerk, he was concerned about his ability to supervise. Jakobsche felt, based on the reports he had received from Nieves' co-workers and past supervisor, that Plaintiff's fellow clerks were afraid of him. Jakobsche gave Nieves an opportunity to respond to his concerns, but Nieves offered

no explanation for the problems he was having getting along with others.

22. It is apparent that Jakobsche and Nieves have widely divergent personalities. While Jakobsche appears cautious and deliberate, Nieves is more outspoken and aggressive. This conflict in personalities apparently led Jakobsche to conclude that Nieves' supervisory style would not fit well with his own.

23. Jakobsche decided to offer the position to Werner. Werner had ten years of experience as a Transit Information Clerk compared to Plaintiff's four. He had been in the bus system for twenty years, he had served as a lead worker for the Transit Information Clerks since October of 1973, his performance evaluations were consistently between satisfactory and outstanding, he had scored the same on the test as the Plaintiff, and finally, he was well-respected by his fellow employees. None of Werner's co-workers ever complained about either his ability as a supervisor or his ability to get along with others. Although the Plaintiff had an edge over Werner in education and prior supervisory experience, Jakobsche concluded that this was not sufficient to overcome Werner's twenty years of commendable performance, his supervisory experience as a lead worker and his well-established relationships with the other Transit Information Clerks.

24. Plaintiff filed an EEOC charge a few months after he failed to obtain the Transit Information Supervisor position. According to Jakobsche, he did not learn Plaintiff was Hispanic until after he received notice of the charge. Plaintiff had no Spanish accent, spoke no Spanish, and according to Jakobsche never mentioned his national origin. Nieves pronounces his name "Neeves" (rhymes with leaves) although the name is traditionally pronounced by Spanish speakers, Ne-ev-ace. In addition, at the time Plaintiff applied for the promotion, his personnel file still indicated that he was Caucasian, and made no mention of his Spanish American nationality. Although the County permits an employee to amend his personnel file at any time, Plaintiff did not amend his file to correct his national origin designation until 1981, three years after he filed his EEOC charge.

25. The EEOC conducted an investigation into Nieves' charge of discrimination and concluded there was probable cause to believe Nieves was discriminated against on the basis of his national origin. The investigator, Robert Metaxa, testified at trial concerning the scope of his investigation and the factors he considered relevant in making his recommendation of probable cause. Mr. Metaxa testified that he found no direct evidence of discrimination, but nevertheless concluded the County was guilty of discrimination because he felt the explanation proffered by the County for its decision was not supported by the objective evidence. He gave no credence to the written test because it was too subjective, though he testified that he never actually saw a copy of the test. Mr. Metaxa never personally met the Plaintiff and was unable to interview a number of witnesses who testified at trial. Mr. Metaxa assumed that the County knew Nieves was Hispanic, despite Nieves' employment application and a memo from Mr. Jakobsche denying that he considered Nieves' national origin. In reviewing the candidates' comparative qualifications, he found that only Nieves had supervisory experience although Werner and Horton also had such experience. He also found that Nieves had the best evaluations although his evaluations for the past three years were no better than Horton's and significantly worse than Werner's. Mr. Metaxa did not consider the comments made by Nieves' co-workers to Mr. Jakobsche because he felt they were unreliable "hearsay". He also did not consider any of the subjective factors considered by Jakobsche such as temperament and ability to get along with others because he felt such factors were not measurable.

26. Since 1976 when Jakobsche first began working for Metrobus, he has hired or promoted 108 persons. Of these persons, 42% were White, 28% were Black, 29%

were Hispanic and 1% were other. Jakobsche has promoted 20 persons since 1976, of these 45% were Hispanic. Plaintiff attempted to discount these statistics by suggesting that Jakobsche had little discretion as to who would be hired or promoted because most hiring and promotion is done on the basis of ranking on eligible lists. As Mr. Jakobsche and the Personnel Director both testified, however, even when hiring or promotion is made from an eligible list, the hiring official has substantial discretion as to who is selected. There is no requirement in the County that hiring or promotion be done strictly on the basis of rank order.

27. The 1970 census figures for the Miami-Dade Metropolitan Statistical Area indicate that the Miami labor force is comprised of approximately 60% White (non-Hispanic), 14% Black and 26% Hispanic. Jakobsche's hiring statistics compare very favorably with these general statistics.

28. In 1981, Metrobus created another Transit Information Clerk Supervisor position. Plaintiff declined to apply for this position even though a new test had been developed by the County's Central Personnel Department. The position was awarded to Patricia Tims, a Black female. In November 1983, Metrobus made Enrique Alvarez-Bulla, an Hispanic male, the Acting Supervisor of the Transit Information Clerks.

29. At a number of times during the trial of the instant cause, the testimony as between Plaintiff and Mr. Jakobsche, Director of Plaintiff's Department, differed greatly with respect to their recollection and interpretation of the facts, events and participants that ultimately gave rise to the instant discrimination claims. The Court has considered these discrepancies in the testimony and based on the respective demeanor of each witness as well as the corroborative nature of the evidence, including the testimony of other witnesses, the Court finds that the testimony of Mr. Jakobsche is more credible than the testimony of Plaintiff. Thus, whenever the testimony between the two witnesses conflicts, the Court attaches more weight to the testimony of Mr. Jakobsche.

30. On the issue of national origin, the Court notes that neither from observing the Plaintiff nor from listening to his speech patterns, mannerisms and pronunciation of the English language was it apparent that Plaintiff was Hispanic. There was no outward indication of this fact. Other than at one point in rebuttal during Plaintiff's testimony, wherein Plaintiff glancingly asserted that the directors and supervisors at Metrobus "knew" Plaintiff was Hispanic, is it apparent from the record that Mr. Jakobsche or others in authority did in fact know that Plaintiff was Hispanic at the time that the position for Transit Supervisor was filled. Therefore, the Court finds that there was no exercise of discrimination by Mr. Jakobsche or any others in authority against Plaintiff.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, in that this action arises under Title VII, a federal statute providing for the equal rights of persons within the United States. Venue is proper in the Southern District of Florida because Plaintiff and Defendant reside within the District.

2. Plaintiff is an employee within the meaning of Title VII, 42 U.S.C. § 2000e(f).

3. Defendant is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

4. In this employment discrimination action involving disparate treatment, the burden is on the Plaintiff to demonstrate that the Defendant has unlawfully discriminated against him. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

5. To establish a *prima facie* case of disparate treatment, the Plaintiff must demonstrate (1) that he is a member of a protected class; (2) that he applied for an available position; (3) for which he was qualified; and (4) that he "was rejected under circumstances which give rise to an

inference of unlawful discrimination". *Id.* at 253, 101 S.Ct. at 1094.

6. The Defendant can rebut the Plaintiff's *prima facie* case "by producing evidence that the Plaintiff was rejected or someone else was preferred for a legitimate, non-discriminatory reason". *Id.* at 254, 101 S.Ct. at 1094. The Defendant's burden is not one of persuasion but only of production. *Id.* at 254–55 & n. 8, 101 S.Ct. at 1094 & n. 8. *See Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 (11th Cir.1983) ("It is important to bear in mind ... that the defendant's burden of rebuttal is exceedingly light.") The Defendant is under no obligation to demonstrate that the person selected was more qualified than the Plaintiff for if two candidates are equally qualified, the choice of which candidate to hire is left to the employer's discretion. 450 U.S. at 259, 101 S.Ct. at 1096.

7. If the Defendant meets its burden of production, the Plaintiff must then demonstrate by a preponderance of the evidence that the Defendant's proffered reason "was not the true reason", but merely a pretext for unlawful discrimination. 450 U.S. at 256, 101 S.Ct. at 1095. The Plaintiff can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence". *Id.* The burden remains on the Plaintiff throughout the trial to prove discrimination by a preponderance of the evidence. *Id.*

8. It is questionable whether Plaintiff even established a *prima facie* case in this action. Although he claims to be Hispanic, he never listed himself as such on his employment application and the credible evidence indicates he never notified anyone in County management that he was in fact Hispanic. During his case in chief and in his deposition, Plaintiff could not recall ever telling Jakobsche he was Hispanic. The only person he could recall mentioning his national origin to was a Mr. Ron Tober who had left the County before Jakobsche even began. Plaintiff may indeed be Hispanic, but it is difficult to see how Jakobsche could have discriminated against him on that basis if he was never made aware of the fact. *See, e.g., Miller v. Mercy Hospital,* 720 F.2d 356 (4th Cir.1983) (District court's finding of discrimination was clearly erroneous where the evidence failed to demonstrate that the employer's agent was aware of the plaintiff's race.)

9. Assuming that Plaintiff did establish a *prima facie* case, it was effectively rebutted by the legitimate reasons proffered by the Defendant. A comparison of Plaintiff to the two successful candidates reveals that Plaintiff was not the best qualified candidate. Both Horton and Werner had significantly more experience than Plaintiff as Transit Information Clerks and in the bus system; Horton and Werner had been with the bus system approximately twenty years while Nieves had been there only four. Horton's and Werner's evaluations were better than Plaintiff's for the three year period considered most significant by Jakobsche. Although Plaintiff was rated overall satisfactory during this period, his 1975–77 evaluations indicated that his relations with fellow employees were "weak". Horton's evaluations were satisfactory, while Werner's were between satisfactory and outstanding. Nieves had eight years of supervisory experience while Werner had five and Horton had run his own business for slightly more than one year. Both Plaintiff and Horton had taken a supervisory training course and Werner had served as a lead worker. Jakobsche legitimately concluded on the basis of these factors that Horton and Werner were better qualified than Nieves. Although Nieves had a slight edge over the other candidates in the category of education, this factor alone is not sufficient to render Jakobsche's decision erroneous.

10. In addition to these objective criteria, Jakobsche also considered a number of subjective criteria in making his decision. While subjective criteria must be scrutinized more carefully than objective criteria, nothing in Title VII precludes their

use in making employment decisions. *See, e.g., Grubb v. W.A. Foote Memorial Hospital,* 741 F.2d 1486 (6th Cir.1984) ("[S]ubjective evaluation is not a *per se* indicator of discrimination."); *Verniero v. Air Force Academy School District No. 20,* 705 F.2d 388, 392 (10th Cir.1983) (Subjective evaluations play a legitimate part in an employer's determination of whether an employee should be promoted.); *Grano v. Department of Development,* 699 F.2d 836, 837 (6th Cir.1983) ("[S]ubjective employment evaluations ... are not illegal *per se.* The ultimate issue in each case is whether the subjective criteria were used to disguise discrimination."); *Hun Ping Wang v. Hoffman,* 694 F.2d 1146 (9th Cir.1982). While an employer may not rely exclusively upon the wholly subjective judgments of a single supervisor, it may rely on subjective judgments to the extent that they are based on actual observations of an employee's performance. *Compare Harris v. Birmingham,* 712 F.2d 1377 (11th Cir.1983) (wholly subjective judgments by white supervisors provide a ready mechanism for discrimination); and *Lee v. Conecuh,* 634 F.2d 959 (5th Cir.1981) (employer may not avoid a finding of discrimination by relying on wholly subjective judgments); with *Knight v. Nassau County Civil Service Commission,* 649 F.2d 157, 161 (2d Cir.1981) (subjective judgments can serve as a legitimate non-discriminatory reason for an employment decision if they are based on specific articulated facts). In fact, as this Circuit noted in *Ramirez v. Hofheinz,* 619 F.2d 442, 446 (5th Cir.1980), supervisory positions sometimes "require subjective evaluation".

11. In this case, Defendants concede that Jakobsche considered some subjective criteria in making his decision, specifically each of the candidates' ability to get along with others. The "ability to get along with others ... is a legitimate business reason for the non-selection of" a candidate for promotion. *Verniero,* 705 F.2d at 392; *Burrus v. United Telephone Co.,* 683 F.2d 339, 342–43 (10th Cir.1982) (an applicant's "inter-personal skills" are a legitimate non-discriminatory reason for non-selection). In making his assessment that Nieves did not get along well with his co-workers, Jakobsche relied on a number of objective criteria. Nieves' personnel file included two evaluations by Jakobsche's predecessor, Peter Andolina, indicating that Nieves' ability to get along with his co-workers was weak. He also received verbal reports from Andolina and Nieves' co-workers, Rosie Johnson and David McCann, that Nieves had difficulty getting along with others. While these assessments of Nieves' temperament may or may not be correct, they are still relevant to the decision-making process. *See, e.g., Moore v. Sears Roebuck & Co.,* 683 F.2d 1321 (11th Cir.1982) (memoranda submitted to an employer concerning performance of the plaintiff are not hearsay because they are not offered to "prove the particulars of their contents, but to help establish that [the employer] was motivated, in making its employment decision".) It is not the defendants' obligation to prove that its assessment of the plaintiff's qualifications was correct, because mere mistakes in judgment do not constitute unlawful discrimination. *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096; *Moore,* 683 F.2d at 1323, n. 4; *Jones v. Orleans Parrish School Board,* 679 F.2d 32, 38 (5th Cir.), *rehearing granted on other grounds,* 688 F.2d 342 (1982). Based upon the information provided to him by Nieves' co-workers and prior supervisor, Jakobsche concluded in good faith that Nieves had difficulty getting along with his fellow employees. Whether Jakobsche's assessment was correct or incorrect, it does not amount to discrimination.

12. Jakobsche's decision also appears to have been based, at least in part, on a conflict between his personality and that of Nieves. Jakobsche is cautious and deliberate while Nieves is more outspoken and aggressive. Personality clashes of this nature can serve as a legitimate non-discriminatory reason for rejection of a candidate and do not amount to discrimination in violation of Title VII. *See, e.g., Mortensen v. Callaway,* 672 F.2d 822, 824 (10th Cir. 1982); *Burrows v. Chemed Corp.,* 567 F.Supp. 978, 985 (E.D.Mo.1983). Jakobsche

apparently concluded that Nieves' personality would not mesh with his approach to management.

13. Although much of the testimony at trial concerned the written test Jakobsche used purportedly as a substitute for an interview, the test ultimately had no effect on the final selection. Werner and Nieves scored equally on the examination, and as a result, it was not a factor in the final decision to promote Werner.

14. Nevertheless, Plaintiff contends that the written test was a poor selection device and a violation of County employment policy. Plaintiff's argument misconstrues the issue in this Title VII action. The issue is not whether Jakobsche's test was a poor one or even whether it violated the County's personnel rules, but only whether it was used intentionally to discriminate against the Plaintiff on the basis of his national origin. Poor selection procedures do not give rise to Title VII liability absent a demonstrably discriminatory motive. *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C.Cir.1982); *Gilchrist v. Bolger*, 733 F.2d 1551 (11th Cir.1984) (whether an employer's policy "is a good employment policy or a bad one or even a policy prohibited under other laws, Title VII does not prohibit employment decisions based on that policy, provided the policy is applied equally to all employees"). Even when an employer misconstrues its own employment policies, Title VII liability may not be imposed if the employer "nonetheless based [its] decision on [the successful candidate's] superior qualifications and not on the plaintiff's race". *Clark v. Huntsville*, 717 F.2d 525, 528 (11th Cir. 1983).

15. Despite Plaintiff's objections to the procedure followed by Jakobsche, no evidence was presented to show that he was treated any differently than any other candidate. Plaintiff objected that he was not interviewed for the promotion, but neither was any other candidate. He objected that he received only one day's notice of the test, but no candidate received notice any earlier. He objected that his test was graded by Jakobsche and not by Central Personnel as required by the Dade County Personnel Rules, but no candidate's test was graded by anyone other than Jakobsche. Each of the witnesses, other than Plaintiff, testified that the procedure followed by Jakobsche complied with the County's rules, but even if it did not there is no proof in the record to suggest that the violation of any rule was a result of discrimination.

16. In attempting to demonstrate that Defendant's proffered reasons were pretext for discrimination, Plaintiff offered the testimony of the EEOC investigator, Robert Metaxa, and the findings of the EEOC. EEOC determinations are generally admissible in evidence, but the court has the discretion to give them as much or as little weight as it deems appropriate under the circumstances. *See, e.g., Dickerson v. Metropolitan Dade County*, 659 F.2d 574, 579 & n. 13 (5th Cir.1981); *Hilton v. Wyman-Gordon, Co.*, 624 F.2d 379, 382–83 (1st Cir.1980); *Smith v. Universal Services, Inc.*, 454 F.2d 154 (5th Cir.1972). *But see Johnson v. Yellow Freight System*, 734 F.2d 1304, 1309 (8th Cir.1984) (court has discretion to exclude EEOC determinations completely in jury trials if sufficient negative factors are present). Once the EEOC determination is admitted, it is within the court's discretion to determine whether to also admit the testimony of the EEOC investigator who made the recommendation for the determination. *Dickerson*, 659 F.2d at 579. The Court admitted the EEOC investigator's testimony but upon consideration concludes for several reasons that it should be given little weight. Metaxa stated that he assumed without investigating that Nieves was Hispanic even though the County contested this issue and the testimony at trial showed that Jakobsche was not aware of Nieves' national origin. Metaxa also concluded that Nieves must have been discriminated against because he was the most qualified candidate, but in making this determination, he made a number of erroneous factual assumptions. For example, he found

that only Nieves had supervisory experience, whereas in fact both Mr. Horton and Mr. Werner also had such experience. He found that Nieves had the best evaluations, whereas in fact Werner had the best evaluations. He also ignored any factor he considered subjective such as temperament and the ability to get along with others. While Metaxa discounted these factors because they were not measurable, they are criteria which may be considered in determining who should be a supervisor. *See, e.g., Verniero v. Air Force Academy School District No. 20*, 705 F.2d 388, 393 (10th Cir.1983) (subjective evaluations play a legitimate part in an employer's determination whether an employee has the ability to get along with others). Metaxa also did not have an opportunity to interview several of the witnesses who testified at trial. As a result, he was not aware of all the factors that Jakobsche considered in making his decision.

17. Metaxa also was not aware of Jakobsche's statistical hiring record. The Supreme Court has held that a "non-discriminatory 'bottom line' and an employer's good faith efforts to achieve a non-discriminatory workforce might in some cases assist an employer in rebutting the inference that particular action has been intentionally discriminatory ...". *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). The statistical evidence in this case clearly indicates that Jakobsche harbors no innate prejudice against Hispanics. The percentage of Hispanics he has hired since he began working for the Defendant is consistent with the percentage of Hispanics in the available labor market.

18. Plaintiff has not demonstrated that the Defendant's proffered reasons for his non-selection were mere pretext for discrimination. Jakobsche did not even know Plaintiff was Hispanic until after Plaintiff filed his EEOC charge. The evidence showed that Jakobsche promoted Horton and then Werner because he felt they were more qualified for the supervisor position than the Plaintiff. Although Plaintiff raised a number of objections to the procedure followed by Jakobsche in making his decision, none of those objections demonstrates discrimination.

19. Plaintiff has failed to establish by a preponderance of the evidence that Defendant denied him a promotion to the position of Transit Information Supervisor because of his national origin.

20. The instant cause shall be DISMISSED WITH PREJUDICE by Final Judgment entered under even date herewith. Each party shall bear its own costs and attorneys' fees.

21. No attorneys' fees shall be awarded to Defendant as the prevailing party. An award of attorneys' fees to the prevailing party is a matter which is committed to the discretion of this Court under Title 42, United States Code, Section 2000e–5(k). The Court finds that commencement of the instant employment discrimination suit was not frivolous, groundless or unreasonable. Accordingly, an award of Defendant's attorneys' fees will not be assessed against Plaintiff.